We'll hear counsel in International Business Machine Corporation versus United Microelectronics Corporation. Mr. Johnson, go ahead. Thank you, Your Honor. May it please the Court. This contract was unusual in that my client, UMC and IBM, agreed to transfer technology under specific and unequivocally clear conditions in the PRC, the People's Republic of China. Those conditions were, one, that a subsidiary be formed which had a 60% ownership in UMC and no more than 40% ownership by a government entity. This was, in effect, a quasi-governmental entity that was going to be operating this facility. So if it's that important, why wouldn't you say, and it's a conditioned precedent, that those things must happen for any of our obligations to arise? Is there language like that in the agreement? You know, the answer is the word conditioned precedent is not used, but the context of all of the provisions make clear that that's exactly what was talked about. And all you have to do is look at 2A. 2A was interesting because 2A is entitled payment and notification. It's not just payment. And this is an amendment that was added to the 2013 agreement. And it says specifically that any time between January 1, 2015, and December 31, 2015, inclusive, UMC will pay IBM the fee set forth in Section 4.1 and simultaneously therewith provide notice. 4.1A. 4.1A. Yes, sorry, Your Honor. And provide notice. But the notice that they were being provided was also very specific. The notice was the name of the sole majority-owned subsidiary and the name of the location of the sole named facility. And then, upon receipt of such payment and notice by IBM, UMC will have the rights associated with such majority-owned subsidiary. Totally within UMC's power not to perform and not to pay anything is your argument, right? Well, no.  The complaint makes it clear. There are no allegations that UMC did anything wrong in connection with the majority-owned subsidiary. But at some point they could say, oh, that's too hard to do this in China. We're just not going to do it. Is it your argument that if they reach that conclusion, they wouldn't have to pay anything? No. My argument is if there was such an allegation and there is not, that would give rise to a factual question which would result in discovery and the normal process would apply as it does in every breach of contract case. Because what you have here is a situation where they assume an outcome. Well, IBM didn't even assume an outcome. They simply said we're going to ignore these provisions and say pay us. If they were to have facts and they didn't plead any, remember this is their complaint, they didn't plead anything that said we did anything wrong in connection with the creation of the subsidiary or the licensed facility. It just didn't happen. It didn't happen. Now, there are reasons. The contract was breached. No, no, it didn't happen because of other facts which were not pleaded. We said you have to show a breach. The breach had to do with whether or not there was the appropriate facility and whether or not there was the appropriate subsidiary. And we had no control over what the Chinese government was going to do. And in this case, the scenario is that unlike the United States of America, which seems to have no difficulty telling the Chinese government what to do in terms of their current debate, somehow UMC would have control over the Chinese government, convince it that it would agree to a 40% ownership share in this subsidiary. This is the contract that they entered into. I'm sorry? This is the contract that they entered into. That's correct. Both sides. Both sides entered into it. But more importantly, both sides said under Section 401A that the license and other rights granted for the named facility. It doesn't say just anything. It says for the named facility, which was defined in 2A, payable any time between January 1, 2015 and December 15. But it's for the named facility. There was no named facility. But more importantly, IBM never alleged that we somehow did anything wrong by not having one. And the reason that's important is the real essence of this agreement had to do with IBM making sure that it did not risk having its technology transferred to a Chinese entity and having that entity do something inappropriate with it. And the only way to prevent that was to have a majority-owned subsidiary controlling things. And what happened here is there was no majority-owned facility. There could be no payment under 401. But more importantly, under 2A, there was a requirement. And that requirement is consistent with everything I'm saying. And that is that there had to be a simultaneous giving of notice to IBM of what? Of the existence of the subsidiary and the licensed facility before payment was made. The reason that was important is IBM was not going to transfer this technology until it knew for certain that the subsidiary and the facility existed. So UMC breached in two ways. They breached because they didn't give them the name of a facility and they didn't pay the $10 million. No, they did not breach because the condition precedent or the tipping points, as you call it, or as they refer to it, didn't happen. And it didn't happen. That was totally within UMC's control. Nobody alleges that. That's not alleged in the complaint. There is nothing in the complaint that alleges that UMC had the ability to control- Contracting parties. UMC has agreed to do certain things. IBM has agreed to do certain things. And UMC didn't do the things that they were supposed to do. But neither did IBM. Take a look at the trade secret definition. Under the definition of the trade secrets, which you will find, Your Honor, in 3.1, IBM could only transfer the trade secret information to the named facility. That's explicit. And you never gave them the name facility. And that is correct. And the point is because both parties had an understanding that there were things they could not control, namely what the People's Republic of China was going to do. And that's why they set up the simultaneous notice. In effect, what you have is a situation where both parties wanted to do a thing, namely establish this subsidiary and the foundry in China, but were unable to do so. And critical is the allegations in the complaint. Nowhere in the complaint does IBM allege that we did anything wrong other than make payments. It was going to be your wholly owned subsidiary. Correct. But- Not IBM's. Ah, but that's right, Your Honor. But here's the point. Let's say the best deal we could get from the Chinese was a subsidiary that, instead of being 60-40, was 55-45. IBM had the absolute ability to walk away. Why? Because they set the terms. And the reason they set the terms, they were trying to protect themselves from improprieties by the Chinese government. So you can't turn around and tell me, well, wait a minute, if you negotiated in good faith and it was only 55-45, that means you breached. I can't breach if I can't control the other side. The People's Republic of China has its own government and its own ability to do as it sees fit. But that goes for both parties. Both parties had the same expectation. There is nothing in there that says we can guarantee what the People's Republic of China is going to do. All it says is the parties agree this is the deal we have to have before there can be a transfer. There was no deal because we couldn't get one, and therefore there was no transfer. And the notion that IBM would articulate is, oh, I'm sorry, I'm out of time. You have the, we would somehow have the ability to control the Chinese government. That makes no sense because IBM was being protected by the very provision which they want to ignore. If I could just ask one more question of you. Yes, sir. You seem to agree that no side is responsible for drafting this agreement, right? Both sides are equally responsible for drafting it? Correct. Is that right? And it looks like the earlier agreement was just kind of cut and pasted. Is that, am I right? Well, actually, I think, I don't, what I think happened, Your Honor, is the 2012 agreement covered four countries and the technology. And when they added China, when they had the four countries, they didn't have to worry about a notice problem. They weren't dealing with any governmental entities. It just looks like they took it and pasted in some A sections, like one of the big sections here is for payments. It goes 4.1, 4.2, 4.3, but then it's 4.1A, which is odd. And there's other sections like that where it looks like parts were just stuck in because of the China deal. Is that right? Well, I don't know if I use the word stuck in, Your Honor, but I would agree with you. They were added to 2013 precisely to cover the China deal. And I will tell you that the record would be that the parties who did that drafting was IBM because IBM needed that protection. And so now what they want to do is to say, hey, you assume all the risk of getting something from the Chinese government, but it's got to be 60-40 or you pay us $10 million. There's nothing in that agreement which would permit that outcome. And I'll address the other sections on rebuttal since I'm running out of time. Thank you. Good afternoon, Your Honors. May it please the Court, I'm Peter Chaffetz, arguing for appellee IBM. Your Honors, this is a textbook case of a party bringing in the lawyers to avoid paying for an asset it no longer needs or no longer wants. There is an unbridgeable gap between the lawyers' theories that you've just heard and the terms of the contract. And to the extent in their briefs they attempt to appeal to extrinsic evidence, which wouldn't be admissible in any event, those arguments only confirm that the gap between their defense and the contractual reality can never be bridged. Your Honors, the payment obligation in Provision 4.1a is unambiguous and unconditional. UMC admits on the reply brief that the 2012 payment obligation under old Section 4.1 is unconditional. And they admit that they agreed to pay $45 million for the original license knowing that it might never use that license. And, in fact, they admit at CA-7 that it never has used that license for which it paid $45 million. Now, look at Section 4.1 and Section 4.1a side by side. Leaving aside the fact that the amount has obviously changed and the due date has changed, the payment obligation under new Section 4.1a states the new payment obligation in virtually identical unconditional terms. In 9.3, you only mentioned 4.1, not 4.1a. Yes, Your Honor. Can you explain that? Yes. If you look at the evidence that they present of what they call the drafting history, you'll see a series of track change pages that show a ministerial conference. It's what Judge Droney referred to. The person at IBM took the old contract and marked it up, and they conformed it, and they put in 4.1a. It's totally ministerial. There's not any evidence whatsoever that there was a deliberative process or a negotiation as to which provisions would be changed and which provisions wouldn't be changed. It's a drafting glitch, and there are other glitches in this contract. That's a good way to put it. Yeah. I mean, it says that they're only obligated to pay $2 million, not $10 million, because it refers only to 4.1, not 4.1a. If it's a glitch. It's, as the trial court recognized, that might be a literal meaning. I think you could also clearly interpret 4.1a coming in directly after 4.1 as a subsection. But let's assume that that's— Sorry, Your Honor. It's not listed. As you know probably better than I do, it's not listed in 9.3. Your Honor, the purpose of Section 9.3 in the original agreement was to make clear that the purchase price, breach of the purchase price provision, is not subject to a $2 million damage cap. It would be absurd to conclude that these parties intended, through leaving out a single letter A from a single section designation in a single provision, to change this contract from an outright license to an option. What was the $2 million cap for? There are countless technical requirements in this contract regarding maintenance of confidentiality, the treatment of the proprietary rights, breach of the territorial provisions of the license, for example. There are countless provisions. It's a very technical license. Don't relate to paying for the— Exactly. But the purpose of Section 9.3 in the original agreement was to make clear the purchase price is the purchase price. You don't set a $2 million damage limitation for breach of a $45 million purchase price or for breach of a $10 million purchase price. It's inconceivable, Your Honor, and it's not a basis—the evidence they have of those track changes paid does not support an inference that there was any deliberative negotiation or intent to make breach of the payment obligation subject to the damage cap. Why isn't this ambiguous, then? Because, as the trial court concluded, if you read all the provisions together, the parties' intent— I'm not trying to do that. How do you do that? I mean, how do you read 4.1a and 9.3, as Judge Pooler has just pointed out, unless you conclude it was taken out for a reason, which is—and this could be the reason—which is at least with the prior deal, the $45 million deal, they got something. No. There was nothing exchanged. There was no technology exchanged. There was technology— In those other four places, right? Yes, I understand that. But here, there was nothing exchanged. So why should they get $10 million when, under a standard breach of contract remedy, you might get maybe $2 million? No, Your Honor. That's not what they bargained for. Why does that make sense? Because you can't read Section 9.3 as contradicting the unconditional obligation to pay $10 million. That would be irrational. Except it doesn't say 4.1a. Okay. But another reason for the Court to be confident that this is a mistake is that there would be no rational basis for the contract to refer to Section 4.1. If it's a mutual mistake, the contract can be rescinded, right? Well— Are you saying that you made a mistake? No. This is clear under New York law, under the Riepe case, which the trial court relied upon, and under the court of appeals decision, that if it's clear what the party's intent was, that the court can make this kind of conforming change and can add or subtract language as needed to effectuate the clear contractual intention of the parties. And it is so clear that these parties intended for payment to be unconditional. Sections 5.3 and Sections 12.5 squarely address what opposing counsel referred to. They addressed the risk of governmental restrictions in three ways. They gave 2.5 years for this to be performed. They made clear that if the governmental interference prevented performance, that that would not be a breach so long as they paid the amount set forth in Section 4.1a. And they also made clear that if they couldn't comply with the notice provision, that that would not be a breach so long as they paid. But Section 5.3, which you just pointed out, references specifically 4.1a. But 9.3 does not. But you say that doesn't matter. It's an oversight. I think the only rational way to read this contract and make every provision function as the party's clearly intended is to read the reference in Section 9.3 to Section 4.1 as intended to encompass Section 4.1a. Otherwise, the reference to Section 4.1 would be completely superfluous, and the court is required to interpret. It calls out 4.1, 4.3, or 4.4. Yes. It doesn't say Section 4. No, no. But I understand, Your Honor, respectfully, in Section 9.3, where it does refer to Section 4.1, that provision would be utterly meaningless if the parties intended it to refer to Section 4.1, because the 4.1 payment had already been made. So it would serve no purpose at all unless it also referred to Section 4.1. This was an old section that was tried to update it and made a mistake in the updating. Yes, Your Honor. The point is we produced all the files we have that are relevant to this. It's a contract case in which they have equal access to all the negotiating record. If this was an option where there was supposed to be a $2 million strike price, that would not happen without leaving a paper trail. And if they wanted to oppose summary judgment, to resist summary judgment, based on the clear inferences of what the parties meant looking at the contract as a whole, they would have come forward with a declarant who was part of that negotiating team and who would say, of course, this was a very important point to us and we agreed to it. That does not happen in a vacuum. They have full access to the documentary record to show that their argument, which you've been probing me on, has factual probability. It's so implausible that it would serve no purpose whatsoever to remand for further proceedings on that because if there were any evidence to support it at all, it would already be before the court. It's a pure drafting glitch and it cannot reasonably be read as anything else. And under the New York Court of Appeals and New York Appellate Division Authority, the court had the power to conform the contract to reflect that obvious contractual intent. I see that my time is out. Thank you, Your Honors. Briefly, Your Honor. You can get to the microphone. Yes. Do you think it was a mistake? No. What you had here was this unique situation concerning the PRC. I do not believe that was a mistake. I believe the parties understood exactly what they were trying to do, which was- That if 4.1A was not vindicated, that is, you didn't pay the $10 million, you could pay only $2 million? Well, yes, if there was a breach. But again, I don't believe they've ever alleged a breach. The only breach they claim is nonpayment, but the requirement includes more than that. That's not a big nonpayment, isn't it? Well, yes, but you had the question that was correctly asked, was what did my client get in return? There was no transfer of technology, and there could not be because under 2A, there had to be certain conditions met. So, in effect, what IBM is saying, yeah, we transferred the technology to you in 2012 and you paid us for it, but we didn't transfer anything to you in 2013, but you still have to pay, reduced to its essence. What they really have argued here is that they somehow had a right to reform this agreement to their benefit. And as we cited in the McNary case, Your Honor, that can only be done after looking at extrinsic evidence. And in this case, there was no extrinsic evidence to look at. The argument he just made about if they had evidence they should produce it, that best made at a trial, certainly not on summary judgment where they are now arguing this agreement says only one thing when we obviously can tell it says and reads completely differently than that. They can't explain away the omission of the section by simply saying it should have been there. Well, IBM, let's assume that they're still the same big company they always were. They knew what they were doing when they did it, and they did not include the link. What were they doing when they left out the A after 4.1? Well, if they left out the A of 4.1 or if they understood that they could not include 401A because this agreement required additional actions concerning the subsidiary and the licensed entity. That's what makes it so unique because, again, we are dealing with a partially Chinese-owned entity, and both parties had concerns, and they struggled, in my opinion, to try to accomplish a result that ultimately was not attained. Did anybody raise ambiguity in the summary judgment aspect of this case? In other words, did anybody say, Your Honor, we can't figure this out? We argued that if there was any. And so we'd like to put on evidence of what the drafters meant when they put together this document. Correct. We argued there was ambiguity. The court said, I can reform this agreement, and simply ignored our arguments to that effect. The whole contract is not before us, which is surprising in view of the fact that we're required to interpret the sections in question as part of a contract, a whole contract. So you decided, both parties, not to give us the whole contract. Correct. Your Honor, I'm at a disadvantage. Yes, it turns out that the parties did agree to redact portions of the contract that were not cited. IBM agrees with that, too. And yet, one of our interpretive tools is to look at the sections in relation to the whole contract. And yet, we can't do that here. Correct? Well, the answer is, you are correct. But the reason has to do with the fact that the trial judge refused to seal the entire contract. So it had to be redacted. If the court would prefer an unredacted version, we don't have any objection to producing it. But the outcome would not change. It is what the record is. Right. Thank you. Thank you, Your Honor. And thanks for allowing me extra time. Thank you. We reserve the decision.